UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

  vs.                                    REPORT AND
                                        RECOMMENDATION

Ocie Pankey,

        Defendant.            Crim.  07-214 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Statements, Admissions, and Answers, and his Motion to Suppress Evidence Obtained as a Result of Search of Seizure.  A Hearing on the Defendant's Motions was conducted on October 1, 2007,[1] at which time, the Defendant appeared personally, and by Manvir

---

[1] At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motion.  Leave was granted, and the last submission on the issues was received on October 17, 2007, at which
(continued...)

K. Atwal, Assistant Federal Defender, and the Government appeared by James S. Alexander, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion to Suppress Statements, Admissions, and Answers, and his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, be denied.

## II.  Factual and Procedural Background

The Defendant is charged with one (1) Count of being a felon in possession of a firearm, in violation of Title 18 U.S.C. §§922(g)(1), and 924(e)(1).  The events which gave rise to those charges are alleged to have taken place on or about October 26, 2006, in this State and District.

At the Hearing, the Government presented the testimony of Rodney Wilson ("Wilson"), who is an Investigator with the Duluth Police Department, and a member of the Lake Superior Drug Task Force.  As pertinent to the charges against the

---

[1](...continued)

time, the Motion was taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

Defendant, and the Motions now before us, the operative facts may be briefly summarized.[2]

At the Hearing, Wilson testified that, on October 26, 2006, he was conducting surveillance in conjunction with a controlled drug purchase, and was sitting in an unmarked squad car, in a parking lot, facing a residence on Seventh Avenue East in Duluth.   While Wilson awaited a drug purchase to take place, he observed the Defendant, who was not a suspect in the drug investigation, emerge from the front door of the residence, stand on the porch for approximately forty-five (45) seconds, and look repeatedly up and down the street.   The Defendant then left the porch, walked to the back of the residence, and again look around as though he were assuring himself that he was not being observed.   Wilson then saw the Defendant reach up onto

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."   See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006).   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.   Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.   See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

the roof of a garage, as though he were placing something on the roof, or checking to see if something were there.  The Defendant then walked back to the sidewalk, while continually looking around to see if he was being watched, and reentered the residence.

Wilson testified that, after the controlled buy took place, he remained in the area, and continued to observe the residence that he had seen the Defendant enter.  As Wilson sat in his vehicle, a woman, who was subsequently identified as Juanita Moy ("Moy"), entered the house, and Wilson could hear an escalating argument from inside the residence.  Moy eventually left the house and, as she was leaving, she picked up something from the street and threw it through the front door, breaking the glass.

According to Wilson, he later determined that Elaine Dickerson ("Dickerson"), who was the renter of the house, telephoned the police, and they arrived on the scene approximately twenty (20) minutes later.  After a uniformed police officer arrived to investigate the argument that led to the breaking of the front door, Wilson walked back along the side of the house to the garage, where he had previously seen the Defendant reach onto the roof.  Although the garage was approximately seven (7) feet high, Wilson testified that, by jumping, he could see onto the roof, and he observed a shotgun wrapped in a black garbage bag, with the barrel clearly protruding outside the

plastic.  Wilson then stood on a chair and removed the weapon from the garage roof, and secured it in the trunk of a police vehicle with the assistance of Investigator Ann Clancey ("Clancey").

After securing the shotgun, Wilson knocked on the door of the residence, and someone, who he later determined to be Dickerson, yelled "come in."  Wilson saw the Defendant inside the house, and asked him if he would be willing to speak with him outside.  The Defendant agreed, and followed Wilson outside the house, where he was joined by Clancey, and another officer.  Wilson testified that all of the officers were wearing plain clothes, and that he had his weapon, and his handcuffs, concealed throughout the interview with the Defendant, who was told that he was not under arrest.

On cross examination, Wilson acknowledged that he considered the Defendant to be a suspect at that time.  Wilson asked the Defendant about the weapon and, although the Defendant initially denied any knowledge of the gun, after Wilson confronted him with his observations, the Defendant admitted that he had purchased the weapon the week before for $20.00.  Wilson then asked the Defendant if he were willing to come to the Police Station to answer more questions, and informed him, at least three (3) times, that he was not under arrest.  The Defendant agreed to answer

additional questions at the Duluth Police Station, after Wilson told the Defendant that he could receive a ride back to his residence afterwards.

At the Duluth Police Station, Wilson seated the Defendant in an interview room that measured approximately eight (8) feet by ten (10) feet, with two (2) exit doors, and which was equipped with video and audio recording devices.  Wilson testified that, prior to the interview, he turned on the videotaping equipment, and that no portion of his interview with the Defendant was omitted from the videotape.  At the start of the interview, Wilson again informed the Defendant that he was not under arrest, that he was free to leave at any time, and that he would be given a ride home at the end of the interview. Wilson also showed the Defendant the exit doors to the room, which were left open during the interview.

The interview, which lasted approximately one (1) hour, was conducted by Wilson and Special Agent Darin Nemerow ("Nemerow"), who were both in plain clothes.  Wilson acknowledged that he told the Defendant that it was possible that he could be charged as a felon in possession of a weapon, but the Defendant was not arrested at the end of the interview, and a police officer gave him a ride back to his house.  The Defendant was not advised of his Miranda rights, see, Miranda v. Arizona,

384 U.S. 436 (1966), during either the interview outside of the Seventh Avenue residence, or the interview at the Duluth Police Station.

Wilson additionally testified that, after his interview with the Defendant, he had interviewed Timothy Johnson ("Johnson"), who is the owner of the garage, and who also owns the apartment house that is located on the street directly below the garage, where the Defendant rented an apartment.  Wilson determined that Johnson used the garage for personal storage, and that no tenants had been given permission to place belongings either inside the garage, or on the roof of the garage.  Wilson also questioned Dickerson, who stated that she had not given the Defendant permission to store anything on her property, or on the roof of the garage.

In addition to Wilson's testimony, the Government also introduced four (4) color reproductions of photographs of the exterior of the Seventh Avenue residence, as well as the adjacent garage, that were taken by Wilson on November 8, 2006, see, Exhibit Nos. 1-4, and a DVD copy of the videotaped interview of the Defendant at the Duluth Police Station on October 26, 2006.  See, Exhibit No. 5.

III.  Discussion

A.    The Defendant's Motion to Suppress Statements, Admissions and Answers.

The Defendant has moved to suppress the statements that he made on October 26, 2006, during his interview with law enforcement officials outside the Seventh Avenue residence, and later that same day, at the Duluth Police Station.  We address each interview in turn.

1.    Standard of Review.  Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444;  United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).  Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning.  See, Miranda v. Arizona, supra at 473; see also, Dormire v. Wilkinson, 249 F.3d 801, 804 (8th Cir. 2001).

- 8 -

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Stansbury v. California</u>, supra at 322, quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983). A list of common indicia of custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

<u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir 1990); see, <u>United States v. Ollie</u>, 442 F.3d 1135, 1137 (8th Cir. 2006); <u>United States v. Czichray</u>, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005); <u>United States v. Axsom</u>, 289 F.3d 496, 500, 501 (8th Cir. 2002).

However, these factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1039 (8th Cir. 2005), citing

<u>United States v. Czichray</u>, supra at 827.  Instead, the <u>Griffin</u> factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest."  See, <u>United States v. Czichray</u>, supra at 827.

Whether or not <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.  See, <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000).  For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  <u>Dickerson v. United States</u>, supra at 434, citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation."  [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961)("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").  The determination "depend[s] upon a weighing of the circumstances of pressure against

> the power of resistance of the person confessing." Stein v.
> New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing

the applicable considerations).

   2.   Legal Analysis.

      a.   The Statement Outside of the Seventh Avenue Residence.  The

Defendant first challenges the admissibility of the statements that he made during his

interview with Wilson outside of the Seventh Avenue residence.  The Government has

acknowledged that the Defendant was not advised of his Miranda rights, at any time

prior to, or during, that interview.  In addition, we accept, absent any evidence to the

contrary, that the Defendant's statements were made in response to direct questioning

from the law enforcement officials.  Accordingly, the pertinent inquiry is whether the

Defendant was in custody, so as to require a <u>Miranda</u> advisory and, if not, whether his statements were otherwise involuntary.

According to his uncontroverted testimony, Wilson knocked on the door of the Seventh Avenue residence, and was invited into the house by Dickerson, who was the renter of the apartment.   Wilson then asked the Defendant, who was inside the apartment, if he would voluntarily step outside to answer questions.   The Defendant agreed to speak with Wilson, and he joined him outside on the sidewalk.   In response to questioning by Wilson, the Defendant initially denied knowledge of the weapon that Wilson had found on the roof of the garage but, after Wilson recommended that he should be honest, the Defendant confessed that the weapon belonged to him.

Although, during his testimony at the Hearing, Wilson acknowledged that he considered the Defendant to be a suspect prior to initiating the interview, Wilson informed the Defendant three (3) times that he was not under arrest, and that he was under no obligation to talk to law enforcement.[3]   As noted by our Court of Appeals,

---

[3]Since early on, the Courts have concluded that "[i]t is insufficient to render an interrogation custodial that the purpose of the interrogation is to obtain potentially inculpatory information from a suspect that has become the focus of the investigation."   <u>United States v. Griffin</u>, 922 F.2d 1343, 1348 (8th Cir. 1990), citing <u>Beckwith v. United States</u>, 425 U.S. 341, 345 (1976), and <u>United States v. Jones</u>, 630

(continued...)

"[w]hile advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine," and "[s]uch a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." See, United States v. Ollie, supra at 1138, citing United States v. Czichray, supra at 826.  Here, the Defendant received both advisories.

Moreover, there was no suggestion that the Defendant's freedom of movement was restrained in any way.  The interview took place on a public sidewalk, rather than inside a law enforcement building, which tends to show that the atmosphere of the interview was not police-dominated.  See, See, United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007)(finding that interview was not custodial when it took place on a public sidewalk); United States v. Martin, 369 F.3d 1046, 1057 (8th Cir. 2004), cert. denied sub nom. Biernat v. United States, 543 U.S. 1035 (2004)(finding that interview was not custodial when it took place at a public restaurant, and the

_____

3(...continued)
F.2d 613, 615 (8th Cir. 1980); United States v. Wallraff, 705 F.2d 980, 991 (8th Cir. 1983)("Similarly, the fact that the investigation has proceeded to a point in time at which it might be said to have focused on the defendant is insufficient to render an interrogation custodial," "and 'does not weigh heavily in that analysis.'"), citing, and quoting, United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979).

defendant's freedom was "unrestrained beyond the ordinary confines of being seated at a table in a public cafeteria.").  No testimony was presented that would suggest that Wilson employed any deceptive stratagems, or strong arm tactics, or that he even raised his voice, at any time during the interview, and the Defendant was not arrested at the end of that conversation.

The Defendant argues that he was not free to end his conversation with Wilson, because he did not genuinely believe that he could walk away from the interview. However, whether the Defendant was in custody is not determined by his subjective belief, but turns on "whether a reasonable person in his shoes would have felt free to end the interview." United States v. Ollie, supra at 1137; see also, United States v. Flores-Sandoval, supra at 1146 ("This determination [of whether an individual was in custody] is 'based on the objective circumstances, not on subjective views of the participants.'"), quoting United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005).  Accordingly, after applying the Griffin factors, we find that a reasonable person would have understood that he could terminate the interview at any time, and that the Defendant was not in custody, during the interview with law enforcement outside the Seventh Avenue residence on October 26, 2006.

b.    <u>The Statement at the Duluth Police Station</u>.  The Defendant also

seeks to suppress the statements that he made during the interview on October 26,

2006, at the Duluth Police Station.  As with the interview conducted earlier that day,

while outside the Seventh Avenue residence, none of the <u>Griffin</u> factors weigh in favor

of a finding of custody.  According to Wilson's uncontested testimony, the Defendant

was told at the beginning of the interview that he was not under arrest, and that he was

free to end the interview at any time.  We have reviewed the video recording of the

interview, see, <u>Exhibit 5</u>, which discloses that the door to the interview room was left

open throughout Wilson's conversation with the Defendant.   Moreover, Wilson

explained to the Defendant, at the beginning of the interview, how to leave the building

if he chose to do so, and he reiterated that the Defendant would be given a ride home

at the conclusion of the interview.

As in the previous interview, at no point was the Defendant handcuffed, or

physically restrained, and he has not argued that the police used any strong arm

tactics, or deceptive strategies, during that interview.  The atmosphere of the interview

was calm and casual throughout, and the Defendant asked for, and was given, two (2)

soft drinks during the course of the interview, and was allowed to use his cell phone

to call his girlfriend.  See, <u>United States v. LeBrun</u>, 363 F.3d 715, 722 (8th Cir.

2004)("While the mere possession of a cellular telephone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained."), citing United States v. Unser, 165 F.3d 755, 766 (10th Cir. 1999).

In fact, the Defendant asked Wilson to speak with his girlfriend and tell her that he was not under arrest, and Wilson complied, assuring her that the Defendant would be driven home at the end of the interview. Furthermore, the atmosphere of the interview was not police-dominated, as only two (2) agents interviewed the Defendant, and they were both in plain clothes, with their weapons concealed. See, United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002)("Miranda warnings need not be imposed simply because the questioning takes place at a police station."), quoting Oregon v. Mathiason, supra at 495. Finally, the interview lasted approximately one (1) hour, at which time, the Defendant was driven home, as Wilson had promised. Id. Accordingly, we find that a reasonable person, under the circumstances confronting the Defendant, would not have believed that he was in custody during his interview at the Police Station, and that a Miranda advisory was not necessary under those circumstances.

Beyond the custodial question, we must also determine, consistent with the requisites of the Fifth Amendment, whether the statements given by the Defendant were voluntary, or whether they were the product of an overborne will.  On the Record presented, we find no evidence to suggest that the Defendant's statements, either earlier in the day, or at the Police Station, were involuntary, with any specific, and evidence-based, instances of coercion.  Rather, the Defendant's interviews were plainly the product of his self-chosen decision to cooperate with law enforcement. The lengths of the interviews were not unduly burdensome, the Defendant was not denied any of the normal accommodations of daily living, and he was not duped into lending his cooperation in an investigation he was otherwise resisting.

Moreover, the Defendant does not suggest, let alone support, the existence of any physical, or mental impairments, that would impact upon the voluntariness question, nor does he urge any age-related naïveté, which would reflect a less than voluntary choice, on his part, to answer law enforcement's questions.  The Defendant has offered no evidence that he was intoxicated during either interview, nor is there any evidence to show that the Defendant was impaired, however slightly, on October 26, 2006.  At the close of the interview in the Police Station, Wilson asked the Defendant

if he had been treated fairly, and the Defendant answered in the affirmative, and we have no reason to conclude that the response was false.

During the interview at the Duluth Police Station, the Defendant asked Wilson about possible penalties, that he might face if he were charged with a crime, and Wilson responded that he could not advise the Defendant about possible outcomes, as the decision to prosecute was left to the District Attorneys, but noted that, if the Defendant were convicted of being a felon in possession of a weapon, he could face imprisonment.  However, that advice, in response to the Defendant's inquiry, would not have overborne the Defendant's will.  Under the law of this Circuit, "[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will * * *."  Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001), citing United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978); see also, United States v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir. 2001)(upholding statements as voluntary when police officers told the defendant that he would receive a life sentence when the actual penalty was twenty-three (23) years).

Accordingly, after viewing the evidence in totality, we find that the Defendant's will was not over-borne, and we conclude that the statements which he made during

the interview outside the Seventh Avenue residence, and at the Duluth Police Station, were non-custodial, and voluntary, and therefore, his Motion to Suppress those statements should be denied.

B.      The Defendant's Motion to Suppress Evidence.

1.      Standard of Review.  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  United States Constitution, Amendment IV.  An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's privacy from arbitrary invasion by the Government.  See, Delaware v. Prouse, 440 U.S. 648, 653-54 (1979); Marshall v. Barlow's Inc., 436 U.S. 307, 312 (1978); Camara v. Municipal Court, 387 U.S. 523, 528 (1967).  Therefore, whether a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Id. at 654.

However, "Fourth Amendment rights are personal rights that may not be asserted vicariously."  United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004),

citing Rakas v. Illinois, 439 U.S. 128, 133-134 (1978).   Any person asserting a Fourth Amendment protection "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."   Minnesota v. Carter, 525 U.S. 83, 83 (1998), citing Rakas v. Illinois, supra at 138-44; see also, United States v. Kuenstler, 325 F.3d 1015, 1019 (8th Cir. 2003)("The Fourth Amendment protects against unreasonable searches and seizures, but its protections are personal and cannot be asserted by persons lacking a legitimate expectation of privacy in the place searched."); United States v. Green, 275 F.3d 694, 698 (8th Cir. 2001)("Fourth Amendment rights are personal and may not be asserted vicariously."), citing United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999).

"To establish a legitimate expectation of privacy, the defendant must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable."   United States v. Green, supra at 699, citing United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995); see also, Minnesota v. Carter, supra at 88; Rakas v. Illinois, supra at 143, n. 12. In the absence of such a showing, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment

rights infringed." <u>Rakas v. Illinois</u>, supra at 134.  In determining whether an individual

had a reasonable expectation of privacy, Courts consider several factors, including

"'ownership, possession and/or control of the area to be searched or item seized;

historical use of the property or item; ability to regulate access; the totality of the

circumstances surrounding the search; the existence or nonexistence of a subjective

anticipation of privacy; and the objective reasonableness of the expectation of privacy

considering the specific facts of the case.'"  <u>United States v. Pierson</u>, 219 F.3d 803,

806 (8th Cir. 2000), quoting <u>United States v. Gomez</u>, 16 F.3d 254, 256 (8th Cir. 1994);

<u>United States v. McCaster</u>, supra at 933 (listing as factors "whether the party had a

possessory interest in the things seized or the place searched; whether the party can

exclude others from that place; whether the party took precautions to maintain privacy;

and whether the party had a key to the premises."); <u>United States v. Quiroz</u>, 57 F.

Supp. 2d 805, 820 (D. Minn. 1999).

     2.   <u>Legal Analysis</u>.  The critical threshold question is whether the

Defendant  had a legitimate expectation of privacy on the roof of the garage where

Wilson found the weapon, which would allow him to assert a Fourth Amendment

claim.  The Defendant acknowledges that he does not have a possessory or ownership

interest in the garage.  However, he argues that he had constructive control of the

garage, based on fact that he resided in a building which was located on the street immediate below the garage, and that he was present on October 26, 2006, at the Seventh Street residence rented by Dickerson, which was immediately adjacent to the garage, and that constructive control gave him a reasonable expectation of privacy on the roof of the garage.

At the Hearing, Wilson testified that he had spoken with Johnson, who owns both the garage, and the building immediately below the garage, where the Defendant was renting an apartment at the time that the search took place.  According to Wilson's uncontradicted testimony, Johnson reserved the garage for his own personal use, and had not given the Defendant, or any other tenant, permission to use the garage, or its roof.  See, <u>United States v. Wiley</u>, 847 F.3d 480, 481 (8th Cir. 1988) (defendant lacked standing when he had no legitimate access to premises without the presence of the owner and had no personal belongings stored there).  The Defendant does not claim that he had a key to the garage, or had previously stored belongings there, either with or without Johnson's permission, and did not have the ability to exclude others from accessing the garage.  Likewise, the Defendant did not pay any rent to use the garage, or claim that any portion of the rent that he paid to Johnson, for his apartment, was so allocated.  See, <u>United States v. Juchem</u>, 2001 WL 34152082

at *4 (N.D. Iowa, April 23, 2001)(no expectation of privacy in garage when defendant had key and permission of owner to enter, but did not pay rent or have permission to exclude others).

Moreover, the Defendant cannot claim that he had a legitimate expectation of privacy in the roof of the garage, based on his presence in the Seventh Avenue residence. Johnson told Wilson that he had not given anyone, including Dickenson, permission to access the garage. Even if Dickenson had the ability to give the Defendant permission to access the garage, she also told Wilson that she had not granted the Defendant permission to store any items, either in or on the garage, or inside her residence.[4]   Therefore, the mere fact that the Defendant was present in the Seventh Avenue house does not afford him the standing to challenge the search of the garage roof.

------

[4]Moreover, as has been well-established, a person does not have a reasonable expectation of privacy at the home of another unless he is an overnight guest. See, Minnesota v. Carter, supra at 89-91, citing Minnesota v. Olson, 495 U.S. 91, 98-99 (1990). In this case, the Defendant does not claim to have been an overnight guest of Dickenson, or that he lived at her residence, or had a key to that residence. See, United States v. Brown, 408 F.3d 1049, 1051 (8th Cir. 2005); United States v. Mendoza, supra at 715.

The Defendant claims that he had a subjective expectation of privacy, based on his constructive control of the garage roof.  "The factors applied to examine if a subjective expectation is objectively reasonable relate to both property interests, and whether the individual claiming the right took measures to protect those interests." United States v. Mendoza, supra at 715.  The Defendant has not shown that he took any steps to protect his alleged interest in the garage, that would support his assertion that he had a subjective expectation of privacy on its roof.  We note that Wilson observed the Defendant take pains, prior to approaching the roof where the weapon was stored, to insure that he was not being observed, which further suggests that he did not anticipate being able to exclude others who might come across the weapon. Although the Defendant obviously sought to keep his criminal activity private, "the subjective expectation of not being discovered conducting criminal activities is insufficient to create a legitimate expectation of privacy." United States v. Nabors, 761 F.2d 465,  469 (8th Cir. 1995), quoting United States v. Meyer, 656 F.2d 979, 982 (5th Cir. 1981).

Since we find that the Defendant does not have any legitimate privacy interest on the roof of the garage, he does not have the right, under the Fourth Amendment, to challenge the search or seizure of goods on that roof.  See, United States v.

- 24 -

Barragan, 379 F.3d 524-529-30 (8th Cir. 2004)("If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."). Accordingly, we recommend that the Defendant's Motion to Suppress Evidence of Search and Seizure be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the Motions of the Defendant to Suppress Statements, Admissions and Answers [Docket No. 11] be denied.

2.     That the Motion of the Defendant to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 12] be denied.

Dated:  October 25, 2007              s/Raymond L. Erickson
                                      Raymond L. Erickson
                                      CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and

Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than November 9, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than November 9, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.